# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SEDGWICK JOHNSON, | ) |
| Petitioner, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES OF AMERICA, | ) No. 14 C 2917 ) ) |
| Respondent. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Petitioner Sedgwick Johnson ("Johnson") has filed a "Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255. (Civ. Dkt. No. 1.)[1] The government has responded (Civ. Dkt. No. 15) and Johnson has filed a reply (Civ. Dkt. No. 18). For the reasons set forth below, petitioner Johnson's motion (Civ. Dkt. No. 1) is denied.

## BACKGROUND

On July 26, 2001, a federal grand jury charged Johnson and his co-defendants, Raymond Cooper ("Cooper") and Kalonji McMillian ("McMillian"), with one count of conspiracy to possess with intent to distribute crack cocaine and powder cocaine in violation of 21 U.S.C. § 846, one count of possession with intent to distribute powder cocaine in violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute crack cocaine in violation of 21

---

[1] For purposes of this order, "Civ. Dkt." refers to the instant case, *United States* v. *Johnson*, 14 C 2917 (N.D. Ill.), and "Crim. Dkt." refers to the underlying criminal case, *United States* v. *Johnson*, 01 CR 543 (N.D. Ill.).

U.S.C. § 841(a)(1). (Crim. Dkt. No. 17.) All three defendants proceeded to trial before a jury on October 15, 2002.

The facts, as presented at trial, are as follows:

The government's case against the defendants stems from the June 5, 2001 arrest of an individual named Jason Rauner ("Rauner"), who was arrested when he attempted to sell approximately one kilogram of cocaine to a confidential source. While in custody, Rauner named Cooper as his supplier and agreed to cooperate with law enforcement officials by arranging a future delivery of cocaine from Cooper.

From June 6, 2001 through June 8, 2001, law enforcement officials recorded numerous telephone calls between Rauner and Cooper, and voicemail messages left by Cooper on Rauner's phone, as Rauner and Cooper negotiated the specifics of the upcoming drug sale.[2] Rauner and Cooper also met face-to-face at a Bennigan's on June 6, 2001, as part of these negotiations.[3] At trial, Rauner testified that he and Cooper had arranged for Cooper to supply Rauner with one kilogram of powder cocaine and one kilogram of crack cocaine. Cooper told Rauner that McMillian, known as "TuTu," would be the individual responsible for cooking the cocaine into crack.

---

[2] The majority of the conversations between Cooper and Rauner were presented to the jury in the form of audiotapes. Rauner, who was a government witness at the trial, helped the government agents prepare transcripts of these recorded conversations, and the transcripts were used at trial as an aid in listening to the audio recordings. Additionally, certain portions of the audiotapes were interpreted by Rauner at trial, and Rauner also testified to the content of the conversations according to his independent recollection. For ease of explanation, the court will use the phrase "Cooper told Rauner" (or similar language) to indicate trial evidence presented to the jury in this fashion, unless otherwise noted.

[3] Although the June 6, 2001 Bennigan's conversation was recorded by law enforcement officials, no audiotape of this conversation was introduced at trial.

On June 8, 2001, at approximately 12:30 p.m., law enforcement officials observed McMillian arrive at Cooper's residence, retrieve a white plastic bag with black markings from the trunk of his car, and then walk with Cooper into Cooper's house.

Later that day, at approximately 2:15 p.m., Cooper met with Rauner in the parking lot of a Sleep Inn.[4] Cooper invited Rauner to come to Cooper's residence to watch McMillian cook the cocaine, but Rauner declined. Cooper also confirmed that Rauner wanted one kilogram of powder cocaine and one kilogram of crack cocaine, and he informed Rauner that, according to McMillian, the cooking process would take about an hour.

At approximately 6:12 p.m. on June 8, 2001, law enforcement observed Cooper driving one car followed immediately by Johnson driving a second car a few blocks away from the Sleep Inn. At approximately 6:18 p.m., Cooper returned to the parking lot of the Sleep Inn and again met with Rauner.[5] As Rauner met with Cooper in the parking lot, he could hear Cooper talking to Johnson over a cell phone, directing Johnson where to park his car. When Rauner asked Cooper how much he owed McMillian for cooking the cocaine into crack, Cooper told him the fee was $500. Cooper asked Rauner where he wanted the cocaine delivered, and Rauner told Cooper to put the bag carrying the drugs on the passenger seat of Rauner's vehicle. Cooper then relayed Rauner's instructions over the phone, and Johnson arrived in his vehicle, pulled up next to Rauner's vehicle, and placed a white plastic bag with black markings in Rauner's vehicle. After delivering the white plastic bag to Rauner's vehicle, Johnson returned to his car and sat there

---

[4] Government agents made a video recording of this meeting. Additionally, Rauner wore a hidden microphone to this meeting, through which government agents recorded Rauner's conversation with Cooper. Both the video and audio recordings were played to the jury at the trial.

[5] Government agents also made a video recording of this meeting, and Rauner wore a hidden microphone to this meeting. Both the video and audio recordings were played to the jury at the trial.

momentarily. He then spoke to Cooper on his cell phone, telling Cooper that he had seen someone looking out of one of the motel windows and warning him to be careful. Cooper, in turn, repeated the warning to Rauner. Cooper and Johnson then left the parking lot of the Sleep Inn together and were observed driving away in separate cars, only to meet moments later at a nearby gas station.

Officer Todd Arthur of the Cook County Sheriff's Office ("Officer Arthur") testified that, after Rauner's meeting with Cooper on the evening of June 8, 2001, Officer Arthur retrieved a white plastic bag with black markings from the floor of the front passenger side of Rauner's vehicle containing a brick of suspected powder cocaine wrapped in clear cellophane, two clear ziplock bags containing suspected crack cocaine, and a third bag containing suspected crack cocaine. The defendants each stipulated that the substances found in the white plastic carrying bag were, in fact, approximately one kilogram of powder cocaine and slightly more than one kilogram of cocaine base. Government expert Mary Beth Thomas testified that Cooper's fingerprints were found on the white plastic carrying bag as well as on one of the ziplock bags containing cocaine base; that McMillian's fingerprint was found on the other ziplock bag containing cocaine base; and that Johnson's fingerprint was found on the white plastic carrying bag. The government also presented telephone records demonstrating that Cooper was in constant contact with Rauner, McMillian, and Johnson on June 8, 2001.

At trial, Rauner testified that he began purchasing powder cocaine from Cooper in 1996 and crack cocaine from Cooper in 1998. Rauner also testified that, when Rauner purchased crack from Cooper, McMillian was the individual who cooked the cocaine into crack. Rauner testified that he witnessed McMillian cooking the cocaine in person, and typically paid Cooper $500 per kilogram of crack cocaine as a fee for McMillian's cooking services. Rauner also testified that

Cooper often "fronted" the cocaine to Rauner, selling the drugs to Rauner on consignment, and Rauner witnessed Cooper and McMillian using each other's contacts to buy and sell drugs. Rauner testified that he also bought powder cocaine and crack cocaine directly from McMillian in 1998 and, in 2000, Rauner sold cocaine to both Cooper and McMillian on several occasions.

At the conclusion of the trial, the jury found each defendant guilty on all three counts charged in the indictment. (Crim. Dkt. Nos. 82-84.) Johnson was sentenced on January 30, 2003, to a term of 360 months' imprisonment, followed by a five-year term of supervised release. (Crim. Dkt. No. 112.) Johnson timely appealed and argued that the district court erred in allowing a DEA Task Force Officer to testify about the mental state of drug couriers generally, that the government made highly prejudicial comments during its rebuttal closing argument, that he should have receive a reduction in his offense level for playing only a minimal role in the criminal activity, and that his sentence violated the Sixth Amendment as interpreted in *United States* v. *Booker*, 543 US. 220 (2005). *See United States* v. *Johnson*, No. 03-1322 (7th Cir. May 4, 2005) ("7th Cir. May 4, 2005 Order") (Crim. Dkt. No. 144). The Seventh Circuit rejected Johnson's arguments regarding the DEA officer's testimony, the government's closing argument, and the minimal role offense level reduction. *Id.* at 2-6. The Seventh Circuit also ordered a limited remand of all of the defendants' sentences pursuant to *United States* v. *Paladino*, 401 F.3d 471 (7th Cir. 2005). This court advised the Seventh Circuit that it would reimpose the same sentences, and on June 1, 2007, the Seventh Circuit affirmed the defendants' sentences. *United States* v. *Johnson*, 240 F. App'x 131 (7th Cir. 2007) (also reported at Crim. Dkt. No. 160).

Johnson then filed a petition for writ of certiorari to the United States Supreme Court. On February 12, 2008, the Supreme Court vacated the judgment and remanded to the Seventh Circuit "for further consideration in light of *Kimbrough* v. *United States*, 552 U.S. [85] (2007)."

*Johnson* v. *United States*, 128 S. Ct. 872 (2008). The Seventh Circuit then remanded the case back to this court to advise whether it would have sentenced Johnson any differently had it known that it had the discretion to deviate from the career offender guidelines if it determined that the crack/powder disparity imposed by the Sentencing Guidelines yielded a sentence greater than necessary to achieve § 3553(a)'s purposes. *United States* v. *Johnson*, No. 13-1322 (7th Cir. Apr. 26, 2013) ("7th Cir. Apr. 26, 2013 Order") (reported at Crim. Dkt. No. 191). On June 11, 2013, following briefing by the parties, the court determined that it would impose the same sentence if the case was remanded for resentencing, (Crim. Dkt. No. 196), and on October 25, 2013, the Seventh Circuit affirmed. *United States* v. *Johnson*, 535 F. App'x 534 (7th Cir. 2013) (also reported at Crim. Dkt. No. 198). On April 14, 2014, Johnson timely filed the pending § 2255 motion. (Civ. Dkt. No. 1.)

## **LEGAL STANDARD**

Under § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b).

Generally, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review under § 2255 in the absence of cause and prejudice. *Massaro* v. *United States*, 538 U.S. 500, 504 (2003). However, a claim for ineffective assistance of trial counsel may be raised for the first time on collateral review. *Id.* at 509.ANALYSIS

Johnson argues in his § 2255 motion that his conviction and sentence should be vacated because his trial counsel, Daniel Wolff ("Wolff"), was ineffective on various grounds and that

the court improperly categorized Johnson as a career offender under the Sentencing Guidelines. For the reasons stated below, the court finds that Johnson is not entitled to relief under § 2255, and his motion is therefore denied without a hearing.

## I. Johnson's Claim for Ineffective Assistance of Counsel

To succeed on his claim for ineffective assistance of counsel, Johnson must establish both that his attorney's representation fell below an objective standard of reasonableness, and that but for his attorney's errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984). If Johnson fails to establish either of the two prongs above, the court's analysis may end without considering the other prong. *Id.* at 697.

An attorney's performance will only be considered deficient for purposes of an ineffective assistance of counsel analysis if it falls "outside the wide range of professionally competent assistance." *Id.* at 690. Attorney performance is evaluated from a highly deferential point of view, and there is a "strong presumption" that attorney conduct was reasonable. *Id.* at 689. Care must be taken to avoid evaluating counsel's performance with the benefit of hindsight, and to instead consider the challenged conduct "from counsel's perspective at the time." *Id.* Attorneys are not obligated to "pursue every conceivable avenue; they are entitled to be selective." *United States* v. *Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993).

A petitioner alleging ineffective assistance of counsel must also demonstrate that his attorney's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 693. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.*

Johnson articulates five reasons that he believes he received ineffective assistance of counsel from Wolff at trial and sentencing. (Civ. Dkt. No. 2 ("Johnson Mem.") at 2-12.) The court addresses each claim in turn below.

### A. Investigation and Interview of Co-Defendants

Johnson first claims that Wolff rendered ineffective assistance by failing to investigate and interview Johnson's co-defendants, McMillian and Cooper. Although McMillian and Cooper maintained their own innocence throughout the trial, the appeal, and their respective § 2255 cases, Johnson has submitted identical affidavits, purportedly signed by McMillian and Cooper, stating that Johnson was not involved in the conspiracy and did not have any knowledge of the contents of the contraband obtained during his arrest. (Johnson Mem. Exs. B & C.) The affidavits also state that McMillian and Cooper both told Johnson before the trial that they would be willing to testify regarding Johnson's noninvolvement. (*Id.*) Johnson claims in his § 2255 motion that Wolff's failure to investigate and elicit the promised testimony was unreasonable and prejudiced Johnson's defense. The court rejects this argument as meritless.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690. When trial counsel has "'reason to believe that pursuing certain investigations would be fruitless . . . ,' a decision not to pursue 'those investigations may not later be challenged as unreasonable.'" *Montgomery* v. *Petersen*, 846 F.2d 407, 413 (7th Cir. 1988) (quoting *Strickland*, 466 U.S. at 691); *see also Earl* v. *Israel*, 765 F.2d 91, 93 (7th Cir. 1985) ("[O]of course if it is reasonable in the circumstances not to conduct a particular investigation, the lawyers failure to do so will not establish ineffective assistance of counsel."). Here, Wolff's failure to interview Johnson's co-

defendants was reasonable because (i) Wolff was denied permission to speak with Johnson's co-defendants by their attorneys, (ii) Wolff was constitutionally prohibited from calling McMillian and Cooper to the stand during their own trial, (iii) McMillian's and Cooper's expected testimony would not have benefited Johnson, and (iv) McMillian's and Cooper's apparent promises to testify on Johnson's behalf were undermined their conduct at trial.

As an initial matter, Wolff did ask to speak with McMillian and Cooper, but their attorneys refused to let him interview their clients. (*See* Civ. Dkt. No. 15 Ex. A ("Wolff Aff.").) According to Wolff's sworn affidavit, he "talked to the attorneys who represented Cooper and McMillian . . . about interviewing their clients" and "[b]oth attorneys told me that they did not want me to talk to their clients and their clients were not going to testify on behalf of Mr. Johnson." (*Id.* ¶ 13.) Because McMillian and Cooper were going to trial, according to their attorneys, "they could not testify regarding [Johnson's] involvement in the offense without admitting to the charges themselves." (*Id.*) Wolff later relayed this response to Johnson, who told Mr. Wolff that he "understood" what Wolff had told him and "accepted it." (*Id.*) As Wolff states in his affidavit, attempting to speak with Johnson's co-defendants without their respective attorneys would have been an ethical violation under Rule 4.2 of the Illinois Rules of Professional Conduct. (*Id.*) For this reason, and a host of others, the failure to interview co-defendants does not constitute ineffective assistance of counsel where that "failure . . . resulted from an inability to obtain permission for the interviews from the witnesses' attorneys." *Monteer* v. *Benson*, 574 F.2d 447, 450-51 (8th Cir. 1978).

Wolff was similarly prohibited from calling McMillian and Cooper to the stand, although such a tactic would have been inadvisable given his inability to interview them before the trial.

McMillian and Cooper were defendants in the same trial as Johnson and accordingly entitled not to testify in their own defense.

Even if Wolff could somehow have compelled McMillian and Cooper to testify, there is no indication that their testimony would have helped Johnson. McMillian and Cooper both offered the same defense at trial, which was that neither of them had anything to do with the alleged crime. Tr. 237-39[6] (McMillian's trial counsel stating that McMillian "did not commit these crimes and did not conspire with anyone that the government alleges he conspired with"); Tr. 244 (Cooper's counsel stating that "Mr. Cooper did not agree with anyone to distribute cocaine and . . . was not the one who caused any distributions of any illegal contraband"). If, as they claimed at trial, McMillian and Cooper were not knowing participants in the drug conspiracy, they would have no way knowing who was and was not a part of the crime. In other words, any testimony exonerating Johnson would have required an admission of guilt. McMillian and Cooper were not willing to make such an admission during the trial, the appeal, and their own § 2255 cases, nor do they appear to do so now—the affidavits state that Johnson was not involved, but do not describe how McMillian and Cooper know of his noninvolvement (since the affidavits do not admit any knowledge about the crime). In light of their respective positions before and during the trial, Wolff had no reason to think that McMillian and Cooper would offer testimony favorable to Johnson. *See United States* v. *Kamel*, 965 F.2d 484, 498 (7th Cir. 1992) (finding that trial counsel's failure to interview another man whom defendant accused of committing the crime at issue was not ineffective assistance because "even had [the man whom

---

[6] "Tr." refers to the trial transcript in the underlying criminal case, *United States* v. *Johnson*, 01 CR 543 (N.D. Ill.).

defendant accused] been present [for trial], it is unlikely that he would have been willing to incriminate himself by testifying in [defendant's] behalf.").

Finally, McMillian's and Cooper's conduct at trial undermines their affidavits swearing that before the trial commenced, they both "advised Mr. Johnson that [they] would testify on his behalf and testify that he was never a participant within the conspiracy and that he did not have knowledge of the evidence that was obtained during his arrest." (Johnson Mem. Exs. B & C.) At trial, the court advised both co-defendants that "regardless of any advice that your lawyers give you as to whether you should testify or should not testify in the case, it's entirely up to you whether you testify or you don't testify." Tr. 1041, 1109-10. Fully apprised of these rights, both McMillian and Cooper exercised their Fifth Amendment rights not to testify in the case. Even in the unlikely event that McMillian and Cooper actually told Johnson they would testify on his behalf at trial, they reneged on that promise when given the chance, probably because it required an admission of guilt. Wolff's anticipation that McMillian and Cooper would refuse to testify, based on their attorneys' statements to Wolff and the defense they offered at trial, was reasonable at the time and, ultimately, accurate. Wolff therefore did not render ineffective assistance of counsel when he decided not to investigate, interview, or demand testimony from Johnson's co-defendants, especially since he was prohibited by law and ethics from taking any of the foregoing actions anyway.

### B. Wolff's Failure to Assert a *Bruton* Objection to Wire Evidence

Johnson next claims that Wolff rendered ineffective assistance by failing to assert a *Bruton* objection to the admission of numerous tape recorded conversations between Rauner and Johnson's co-defendants, McMillian and Cooper. Johnson's claim lacks merit. The tape recorded conversations were not testimonial statements and thus did not implicate the Sixth Amendment Confrontation Clause. Any *Bruton* objection by Wolff at trial would have been meritless.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Because of this right, "[i]f a co-defendant makes an out-of-court confession that inculpates the defendant, and the co-defendant does not testify at their joint trial, the out-of-court statement cannot be introduced as evidence at all; the risk of prejudice to the non-confessing defendant is simply too great, even with a limiting instruction." *United States* v. *Volpendesto*, 746 F.3d 273, 290 (7th Cir. 2014) (citing *Bruton* v. *United States*, 391 U.S. 123, 123 (1968)); *see also Gray* v. *Maryland*, 523 U.S. 185 (1998); *Richardson* v. *Marsh*, 481 U.S. 200 (1987).

The tape recorded conversations admitted at trial did not merit a *Bruton* objection because they did not implicate the Confrontation Clause. In *Crawford* v. *Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the admission of a witness's "testimonial statement" unless that witness is unavailable to testify at trial and the defendant has a prior opportunity to cross examine the witness. *Id.* at 68. The Confrontation Clause does not, however, apply to statements that are not testimonial in nature. *See Davis* v. *Washington*, 547 U.S. 813, 824-25 (2006); *United States* v. *Watson*, 525 F.3d 583, 588-89 (7th Cir. 2008).

"Testimonial statements" include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; . . . [responses to] police interrogations"; and statements "give in formal pleadings, such as affidavits, declarations, or confessions, or . . . when 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Watson*, 525 F.3d 583, 588-89 (7th Cir. 2008) (quoting *Crawford*, 541 U.S. at 52, 68). By contrast, a "private statement to a confederate, which was secretly recorded, does not fit into any of *Crawford*'s broad categories of testimonial

evidence." *Watson*, 525 F.3d at 589. Accordingly, "[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." *Id.* (citations omitted); *see also Davis*, 547 U.S. at 825 (noting statements made "unwittingly" to a government informant are "clearly nontestimonial"); *United States* v. *Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005) (rejecting defendants' Confrontation Clause challenge to tape recorded conversations because "[t]he recordings featured the statements of co-conspirators," which "by definition, are not hearsay" and do not implicate *Crawford*).

Here, the government introduced tape recorded conversations between Rauner, an informant, and McMillian and Cooper, Johnson's co-conspirators. These statements, by definition, were not hearsay and were admissible under Federal Rule of Evidence 801(d)(2)(E). They were similarly not testimonial in nature and thus did not implicate the Confrontation Clause (or *Bruton*). Any objection to the introduction of the tape recorded conversations would have been without merit, and Wolff's decision not to make such a non-meritorious objection was reasonable.

### C. Inclusion of Drug Quantities in Indictment and Jury Instructions

Johnson next claims that the government failed to allege drug quantity in the indictment or prove that quantity to the jury beyond a reasonable doubt, and that Wolff unreasonably failed to object to the court's imposition of a sentence above the maximum that would apply absent such a showing. As the government notes in its response, the indictment (Crim. Dkt. No. 17), the jury instructions (Crim. Dkt. No. 80), and the special verdict form (Crim. Dkt. No. 84) all undermine Johnson's claim.

The indictment alleges, at various points throughout the indictment and on the first page, that Johnson and his co-defendants "conspired with each other, to knowingly and intentionally possess with intent to distribute and to distribute . . . in excess of 50 grams of mixtures

containing cocaine base, commonly referred to [as] 'crack cocaine,' . . . and in excess of 500 grams of mixtures containing cocaine ('powder cocaine')." (Crim. Dkt. No. 17 at 1, 3, 6, 7.)

At trial, the court instructed the jury on how to fill out the special verdict form, including the various findings the jury could make on drug quantity:

> [T]he interrogatory related to Sedgwick Johnson with regard to Count 1 states: 'If you find Defendant Sedgwick Johnson guilty with respect to Count 1, answer the following interrogatory: We, the jury, find the amount of powder cocaine and crack cocaine involved in Count 1 that has been proved beyond a reasonable doubt is as marked below.' And then there's the parenthetical explanation which states: 'The amount of powder cocaine and crack cocaine involved in Count 1 is equal to (1) the amount that you find beyond a reasonable doubt the defendant conspired to possess with intent to distribute, plus (2) any amounts that you find beyond a reasonable doubt that the defendant's conspirators in furtherance of the conspiracy agreed to possess with intent to distribute and that were known or reasonably foreseeable to the defendant.' And then there are the two columns; first, powder cocaine on the left, 'more than 500 grams of powder cocaine' is the first alternative choice; the second alternative choice is 'less than 500 grams of cocaine;' the third alternative choice is 'no powder cocaine.' In the right-hand column which deals with the cocaine base or crack cocaine, the first alternative choice is "more than 50 grams of crack cocaine;" the second alternative choice is 'less than 50 grams of crack cocaine;' and the third alternative choice is 'no crack cocaine.'

Tr. 1378-79. Finally, the jury found Johnson guilty as charged under Count I, and further found on the special verdict form that the offense involved an amount of powder cocaine that was more than 500 grams and an amount of crack cocaine that was more than 50 grams. (Crim. Dkt. No. 84 at 2.)

It is clear that the government alleged the relevant drug quantity in the indictment and proved the relevant drug quantity beyond a reasonable doubt at trial. Johnson's claims to the contrary are simply inaccurate, and Wolff's failure to raise the baseless claims at trial does not constitute ineffective assistance.

**D. Failure to Inform Johnson of Plea Offer or Pursue Plea Negotiations**

Johnson next argues that Wolff provided ineffective assistance by advising Johnson "to forgo a more favorable plea offer from the [g]overnment and proceed to trial." (Johnson Mem. at 8.) Johnson's argument assumes that the government in fact communicated a plea offer to Wolff, although Johnson has cited no evidence in support of this supposition. Wolff has attested that he does not recall the government ever communicating a written or formal plea agreement for Johnson. (Wolf Aff. ¶¶ 10-11.) Wolff does recall that he advised Johnson that the government's evidence against him was strong and that he was unlikely to win at trial, and that Johnson nevertheless rejected the idea of a plea out of hand. (*Id.* ¶¶ 6, 9.) Johnson later stated that he might be willing to accept a plea agreement that required him to serve only "a couple" of years in jail. (*Id.* ¶¶ 9-10.) Wolff approached the government to discuss the possibility of such an agreement, but counsel for the government advised him that the government would not agree to a plea that carried only a minimal term of imprisonment. (*Id.* ¶ 10.) Counsel for the government further advised Wolff that it "may" be willing to enter into an agreement in which it agreed to dismiss Counts Two and Three of the indictment if Johnson pled guilty to Count One. (*Id.*) If Johnson wanted a sentence below his applicable guideline range, however, Johnson would have to cooperate with the government and testify against his co-defendants. (*Id.*) Wolff has attested that he relayed the government's proposal to Johnson and at all times understood the proposal to be informal. (*Id.* ¶¶ 10-11.)

According to Wolff, Johnson rejected the government's informal proposal because he would not agree to serve anything more than a minimal sentence and would not cooperate with the government against Cooper and McMillian. (*Id.* ¶ 10.) Johnson, by contrast, has attested that Wolff advised him that since his voice was not identified in any of the recorded conversations and since his fingerprints were not found on the drug evidence, he could not be convicted under

federal law unless Cooper and McMillian testified against him at trial. (John Mem. Ex. A at 1.) Based on Wolff's "advice" regarding the government's case, Johnson attests that he decided to reject the government's offer to dismiss Counts Two and Three in exchange for a guilty plea to Count One, and instead proceed to trial. (*Id.*)

The record in this case shows that the government never extended a formal plea offer to Johnson, and Wolff cannot have been ineffective for failing to advise Johnson to accept a non-existent offer. To the extent Johnson argues he decided not to explore further the government's informal proposal based on Wolff's advice concerning the strength of the government's case, Johnson has failed to demonstrate prejudice.

Even accepting as true Johnson's claim that Wolff advised him that the government's case against him was weak given the absence of fingerprint evidence—a claim undermined by Wolff's attestation that he accurately described the fingerprint evidence to Johnson, (Wolff Aff. ¶ 5), and the fact that Johnson's fingerprints were indeed discovered on the drug evidence—there is no evidence from which the court can find a reasonable probability that the Johnson would have accepted a plea agreement consistent with the government's informal proposal. *See Lafler* v. *Cooper*, 132 S. Ct. 1376, 1385 (2012) ("[A] defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea . . . ."). The record shows that Johnson would not accept more than a minimal prison sentence and that the government's informal proposal would have required him to plead guilty to a conspiracy count that carried a statutory mandatory minimum sentence of ten years' imprisonment. (Johnson Mem. at 8, Johnson Aff. 1.) Moreover, the record shows that Johnson rejected a plea offer based on his profession of innocence, which he maintained throughout the trial and his sentencing. *See* Sent.

Tr. 28 ("I've been in trouble all my life, and everything I've ever been in trouble for, I knew I did it, so I always made a plea with the court and did my time. For the first time in my life of 35 years, . . . I feel I'm going to jail for a crime that I had nothing to do with.") *See Quintana* v. *Chandler*, No. 08 C 5629, 2012 WL 3151260, at *9 (N.D. Ill. Aug. 2, 2012) (Chang, J.) (finding that persistent profession of innocence is "relevant to showing that [defendant] would not have changed course from proclaiming innocence to taking the plea offer.") Accordingly, even accepting as true Wolff's allegedly incorrect assessment of the strength of the government's case, the court cannot find that there is a reasonable probability that Johnson would have accepted a plea agreement carrying a ten-year mandatory minimum sentence, even if such an agreement eventually materialized based on Wolff's informal discussions with the government.

### E. Ineffective Counsel at Sentencing

Johnson next claims that Wolff was ineffective at sentencing because he failed to argue that Johnson was eligible for a four-level minimal role reduction under U.S.S.G. § 3B1.2(a). The court need not consider whether Johnson was in fact a "minor participant" under § 3B1.2(a) because Johnson was sentenced as a career offender. The Seventh Circuit has repeatedly held that mitigating role adjustments do not apply to defendants sentenced under the career offender table. *See United States* v. *Otero*, 495 F.3d 393, 401 n.4 (7th Cir. 2007) ("Because [defendant] was sentenced as a career offender, minimal and minor role reductions under § 3B1.2 do not apply."): *Ward*, 144 F.3d at 1036 (holding career offender provision bars minor participant reduction under § 3B1.2).

## II. Career Offender Status

Johnson's final claim, and his only claim that does not relate to the performance of his counsel, is that the court erroneously considered his prior convictions in deciding to sentence him as a career offender. Again, however, the court need not reach the merits of Johnson's claim

because the Seventh Circuit has repeatedly held that "the erroneous determination that the petitioner was a career offender in calculating his sentence [is] not a cognizable error under § 2255 post-*Booker*." *United States* v. *Coleman*, 763 F.3d 706, 708 (7th Cir. 2014) (citing *Hawkins* v. *United States*, 706 F.3d 820, 823-25 (7th Cir. 2013)). As discussed earlier in this opinion, the court reimposed its original sentence after considering *Booker*'s holding that the Guidelines are not binding on a district court judge, (*see* Crim. Dkt. No. 157), and after considering *Kimbrough*'s holding that a district judge may deviate from the career offender guideline if the judge determines that the crack/powder disparity imposed by the Guidelines yields a sentence greater than necessary to achieve § 3553(a)'s purposes. The Seventh Circuit affirmed the court's sentence. (Crim. Dkt. No. 198.) Accordingly, even if the court erred in applying the career offender guideline in Johnson's criminal case, the claim is not cognizable in his § 2255 case.

### III. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, this court denies the issuance of a certificate of appealability ("COA"). To be entitled to the issuance of a COA, the movant must have made a "substantial showing of the denial of a constitutional right." *Slack* v. *McDaniel*, 529 U.S. 473, 483 (2000). This standard requires the movant to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The arguments expressed in Johnson's § 2255 motion are meritless, fail to establish prejudice, or are not corrigible in a post-conviction proceeding. Consequently, this court finds that its resolution of Johnson's constitutional claims is not debatable among reasonable jurists.

## CONCLUSION

For the reasons set forth above, petitioner Sedgwick Johnson's "Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255 [1] and the issuance of a certificate of appealability are denied. Johnson's motion "ask[ing] that this court grant [his § 2255] motion" [20] is also denied. Johnson's "motion in reply" [18] is a reply brief, not a motion, and thus moot. Civil case terminated.

ENTER:

_____
JAMES F. HOLDERMAN
District Judge, United States District Court

Date: May 28, 2015